BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. BYRD (190634)
byrd@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
BRITTANY N. DEJONG (258766)
dejong@whafh.com
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:  619/234-4599

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| APEX COMPUTERS, INC. on behalf of itself and others similarly situated, <br><br> Plaintiff <br><br> v. <br><br> HEADWAY TECHNOLOGIES, INC.; MAGNECOMP CORPORATION; MAGNECOMP PRECISION TECHNOLOGY PUBLIC COMPANY, LTD.; NAT PERIPHERAL (DONG GUAN) CO., LTD.; NAT PERIPHERAL (H.K.) CO., LTD.; NHK SPRING CO., LTD; NHK INTERNATIONAL CORPORATION; NHK SPRING (THAILAND) CO., LTD.; NHK SPRING PRECISION (GUANGZHOU) CO., LTD.; SAE MAGNETICS (H.K.) LTD.; TDK CORPORATION; and TDK CORPORATION—HUTCHINSON TECHNOLOGIES, INC., <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## I.     NATURE OF THE ACTION

1.     Plaintiff Apex Computers, Inc. ("Plaintiff"), on behalf of itself and all others similarly situated (the "Classes" as defined below), hereby brings this class action lawsuit alleging anticompetitive conduct by defendants Headway Technologies, Inc., Magnecomp Corporation, Magnecomp Precision Technology Public Co. Ltd., NAT Peripheral (Dong Guan) Co., Ltd., NAT Peripheral (H.K.) Co., Ltd., NHK Spring Co. Ltd., NHK International Corporation, NHK Spring (Thailand) Co., Ltd., NHK Spring Precision (Guangzhou) Co., Ltd., SAE Magnetics (H.K.) Ltd., TDK Corporation, and TDK Corporation--Hutchinson Technology Inc. (collectively, "Defendants"). Plaintiff hereby alleges that Defendants engaged in a conspiracy to fix the prices and allocate market shares of suspension assemblies ("SAs") used in hard disk drives ("HDDs") in violation of various state antitrust, consumer protection, and equitable laws as alleged herein.

2.     Plaintiff seeks to represent a proposed class consisting of all persons and entities who, during the period from and including May 2008 through such time as the anticompetitive effects of the Defendants' conduct ceased (the "Class Period"), indirectly purchased a product not for resale, which included as a component part one or more HDD SAs that were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants.

3.     At all relevant times, Defendants manufactured and sold SAs used in HDDs throughout and into the United States. As of 2016, Defendants TDK Corporation and NHK spring Co., Ltd., along with their subsidiaries, were the leading manufacturers of SAs for HDDs, with a combined worldwide market share of approximately 90%.[1]

4.     During the Class Period, Defendants and their co-conspirators contracted, combined, or conspired to fix, raise, maintain, and/or stabilize prices of and allocate market shares for HDD SAs in the United States.[2]

---

[1]     Dr. Robert N. Castellano, *The Dynamics of the HDD Industry and Its Impact on CMP* at 9, INFORMATION NETWORK (2012), https://nccavs-usergroups.avs.org/wpcontent/uploads/CMPUG 2012/CMP2012_9castellano.pdf.

[2]     *See* Information, *United States of America v. NHK Spring Co., Ltd*, 2:19-cr-20503 (E.D. Mich. Jul. 29, 2019), ECF No. 1 ("NHK Information").

5.      Since at least 2016, United States and foreign governments have investigated potential price-fixing of HDD SAs. On July 26, 2016, it was revealed that the Japanese Fair Trade Commission ("JFTC") raided the offices of defendants NHK Spring Co., Ltd. and TDK Corporation in Japan in connection with an antitrust investigation concerning the manufacture and sale of SAs for HDDs.[3] NHK Spring Co., Ltd. confirmed the occurrence of the raid on its website.[4]

6.      Concurrently with the JFTC investigation, the DOJ opened an investigation regarding HDD SAs. Pursuant to that investigation, on July 26, 2016 Defendant Hutchinson Technology, Inc. received a letter from the DOJ requesting documents relating to the investigation.[5]

7.      On February 9, 2018, the JFTC issued a cease and desist order to both Defendants TDK Corporation and NHK Spring Co., Ltd., found that they substantially restrained competition in the HDD SAs market by agreeing to maintain sales prices, and fined NHK and another entity – believed to be Defendant TDK Corporation – 1076.16 million yen for fixing the prices of SAs for HDDs.[6]

8.      On April 26, 2018, it was reported that CADE--Brazil's Administrative Council for Economic Defense was conducting a probe into a cartel in the global market involving hard disk components that involved five companies (including NHK and TDK Corporation and at least 38 individuals) and allegations of collusion from 2003 to May 2016 to fix prices of HDD

---

[3]      *See TDK, NHK Spring searched over alleged price cartel*, JAPAN TIMES (July 26, 2016), https://www.japantimes.co.jp/news/2016/07/26/business/corporate-business/tdk-nhk-spring-searched-alleged-price-cartel/#.XV8U2uNKhtQ.

[4]      *See*  NHK Spring Co., Ltd. Consolidated Financial Statements for years ended March 31, 2018 and 2017 at 20, available at https://www.nhkspg.co.jp/eng/ir/pdf/Annual%20Report%202018.pdf.

[5]      *See Hutchinson Technology Provides Update on Legal and Regulatory Actions*, GLOBENEWSWIRE (July 27, 2016), https://www.globenewswire.com/news-release/2016/07/27/859501/0/en/Hutchinson-Technology-Provides-Update-on-Legal-and-Regulatory-Actions.html.

[6]      *See* Press Release, JFTC (Feb. 9, 2018), https://www.jftc.go.jp/houdou/pressrelease/h30/feb/180209_1.html; NHK Spring Co., Ltd. Consolidated Financial Statements for years ended March 31, 2018 and 2017 at 34, available at https://www.nhkspg.co.jp/eng/ir/pdf/Annual%20Report%202018.pdf.

SAs. The international cartel allegedly shared data and allocated customers to maintain artificially high prices on HDD SAs used in hard disks.[7]

9.    On July 29, 2019, the DOJ filed a one-count information against NHK alleging that it and an unidentified company (believed to be TDK Corporation) "knowingly entered into and engaged in in a conspiracy to suppress and eliminate competition by fixing prices for HDD suspension assemblies sold in the United States and elsewhere." A press release issued the same day indicated that NHK had agreed to plead guilty to a violation of Section 1 of the Sherman Act (15 U.S.C. §1) and pay a fine of $28.5 million.[8]

10.    The conspiracy is international in nature. As explained in a July 26, 2016 article published by NHK World (no relation to Defendant NHK Spring Co., Ltd.):

> The 2 firms [TDK Corporation and NHK Spring Co., Ltd.] make a part called an "arm" that supports the magnetic head in a hard drive. They sell their products to Japanese and US makers of data storage devices.
>
> Sources close to the investigation say the 2 makers have allegedly rigged bidding and have also been suspected of forming a cartel to raise prices since several years ago.
>
> The 2 firms together have a 70 percent share in the global market for the component in question. But demand for hard drives has declined due to the growing popularity of a smaller, faster storage device called a flash memory.

11.    The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition for HDD SAs by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of HDD SAs sold in the United States and elsewhere. The combination and conspiracy engaged in by the Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman

---

[7]    *See* Press Release, CADE, CADE's General Superintendence Probes Cartel in the Global Market for Hard Disk Components (Apr. 26, 2018), http://en.cade.gov.br/cades-general-superintendence-probes-cartel-in-the-global-market-for-hard-disk-components-1; *see also* CADE's General Superintendent Coordination of Antitrust Analysis 4/2018 (SEI No. 0459666), available at http://en.cade.gov.br/.

[8]    Press Release, DOJ, Japanese Manufacturer Agrees to Plead Guilty to Fixing Prices for Suspension Assemblies Used in Hard Disk Drives (July 29, 2019), https://www.justice.gov/opa/pr/japanese-manufacturer-agrees-plead-guilty-fixing-prices-suspension-assemblies-used-hard-disk; NHK Information at 2-3.

Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment.

12.    As a direct and proximate result of the anticompetitive and unlawful conduct alleged herein, Plaintiff and the Classes (as defined below) paid more during the Class Period for HDD SAs than they otherwise would have paid in a competitive market, and have thereby suffered antitrust injury to their business or property.

## II.    JURISDICTION AND VENUE

13.    This complaint is filed pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26) to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages under state antitrust, unfair competition, and consumer protection laws, and to recover costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of the Defendants' violations of those laws.

14.    The Court has subject matter jurisdiction over the federal claim pursuant to 28 U.S.C. §§ 1331 and 1337.  The Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

15.    This Court also has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a state different from any defendant" and the "matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs." This Court also has jurisdiction under 28 U.S.C. § 1332(d) because one or more members of the class is a citizen of a state within the United States and one or more of the Defendants is a citizen or subject of a foreign state.

16.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period, one or more of the Defendants resided, transacted business, was found within, and/or had agents within this District, and because a substantial part of the events giving rise to Plaintiff's claims occurred,

and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.

17.     This Court has personal jurisdiction over Defendants because, *inter alia*, each Defendant, either directly or through the ownership and/or control of its United States subsidiaries: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of SAs for HDDs throughout the United States, including in this District; (c) has substantial aggregate contacts with the United States as a whole, including this District; and/or (d) engaged in an illegal price-fixing conspiracy and agreement that was directed at, and had the direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

18.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on international commerce and the interstate commerce of the United States. HDD SAs manufactured abroad and sold for use in products in the United States are goods brought into the United States for sale, and as such, Defendants' activities had a direct, substantial and reasonably foreseeable effect on the United States commerce.

19.     Defendants' anticompetitive conduct, and such conduct's effect on commerce in the United States, as described in this Complaint, proximately caused, and continues to cause, antitrust injury to members of the Classes.

20.     Defendants' collusive conduct was intended to, and did, cause injury to Plaintiff and the Classes, who indirectly purchased Defendants' and their co-conspirators' HDD SAs. Defendants expressly aimed their conspiracy at the U.S. marketplace, and their collusive conduct has resulted in an adverse monetary effect on indirect purchasers in each state identified herein.

**III.    INTRADISTRICT ASSIGNMENT**

21.     Intradistrict assignment to the San Francisco Division is appropriate. The practices

at issue affect adversely persons or entities who reside in that division and paid excessive conspiratorial prices for SAs for HDDs.

## IV.     THE PARTIES

### A.     Plaintiff

22.     Plaintiff Apex Computers is a resident of Massachusetts. During the Class Period, Apex Computers purchased HDD SAs in the State of California and the State of Illinois, indirectly from at least one of the Defendants, and was thus injured in its business or property as a result of Defendants' unlawful conduct alleged herein.

### B.     NHK Defendants

23.     Defendant NHK Spring Co., Ltd. is a Japanese corporation that has its headquarters at 3-10 Fukuura, Kanazawa-ku, Yokohama, 236-0004 Japan. It is organized into multiple divisions that include multiple divisions that make automobile seats and suspension systems, industrial machinery and equipment, and "DDS" (disk drive suspensions). For the 2015 consolidated fiscal year, it reported 640.5 billion yen in sales. Its 2014-15 Financial Handbook forecasted 96 billion yen in net sales for "North America and Others." According to a 2014 report, NHK Spring Co., Ltd. has 32 overseas companies, including seven in North, Central, and South America. NHK Spring Co., Ltd. sells SAs for HDDs to customers located in the United States and elsewhere, including (among others) Western Digital Corporation ("Western Digital") and Seagate Technology LLC ("Seagate") in the United States and Hitachi Corporation in Japan. In 2015, it is estimated to control nearly 40% of the global market for SAs.

24.     Defendant NHK International Corporation is a wholly-owned United States subsidiary of NHK Spring Co., Ltd. It has major offices at 46855 Magellan Drive, Novi, Michigan 48377 and 2350 Mission College Boulevard, Suite 1090, San Jose, California 95054. According to a 2014 report by NHK Spring Co., Ltd., NHK International Corporation handles sales and support of data communications components and has responsibility in the United States for "HDD-related parts."

25.     Defendant NHK Spring (Thailand) Co., Ltd. is a Thai corporation with its principal place of business in Samutprakarn, Thailand. It is an affiliate of and wholly controlled by NHK

Spring Co., Ltd.

26.     Defendant NHK Spring Precision (Guangzhou) Co., Ltd. is a Chinese corporation with its principal place of business in Guangzhou, China. It is an affiliate of and wholly controlled by NHK Spring Co., Ltd.

27.     Defendant NAT Peripheral (Dong Guan) Co., Ltd. ("NAT Dong Guan") is a Chinese corporation with its principal place of business in Guangdong, China. It is an affiliate of and wholly controlled by NHK Spring Co., Ltd.

28.     Defendant NAT Peripheral (H.K.) Co., Ltd. ("NAT H.K.") is a Chinese corporation with its principal place of business in Hong Kong, China. It is an affiliate of and wholly controlled by NHK Spring Co., Ltd. NAT H.K. began as a joint venture between SAE Magnetics (H.K.) Ltd., a wholly-owned subsidiary of TDK Corporation and NHK Spring Co., Ltd., and was dissolved as of April 1, 2015. NAT produced SAs commencing in 2005.

29.     NHK Spring Co., Ltd., NHK International Corporation, NHK Spring (Thailand) Co., Ltd., NHK Spring Precision (Guangzhou) Co., Ltd., NAT Dong Guan, and NAT H.K. will be referred to collectively herein as "NHK."

**C.     TDK Defendants**

30.     Defendant TDK Corporation is a Japanese corporation that has its headquarters at Shibaura Renasite Tower, 3-9-1 Dnibaura, Minato-Ku, Tokyo 108-0023, Japan. TDK Corporation produces a variety of products, including inductors, transformers, capacitors, batteries, magnets, flash storage products, and HDD heads and SAs. In the 2015 fiscal year, its net sales were 1.082 trillion yen. TDK began producing SAs for HDDs when it acquired Defendant Magnecomp Precision Technology Public Company Limited ("MPT"), a manufacturer of SAs based in Thailand. MPT became a consolidated subsidiary of TDK Corporation in November of 2007. TDK Corporation's customers for SAs (through MPT) included such companies as Seagate and Western Digital in the United States, among others. In 2015, TDK Corporation is estimated to control 40-45% of the global market of SAs for HDDs.

31.     As noted above, Defendant MPT is the subsidiary of TDK Corporation that manufactures and sells SAs on behalf of TDK Corporation. It is a Thai corporation having its

principal place of business at 162 M.5 Phaholyothin Road, T.Lamsai A.Wangnoi, Ayutthaya 13170, Thailand. MPT is in the business of selling SAs for HDDs on a global basis, including to customers in the United States.

32.    Defendant Magnecomp Corporation ("MC") is a United States corporation that has its headquarters at 38975 Sky Canyon Drive, Suite 111, Murrieta, California 92563. MC operates as the domestic agent for MPT.

33.    Defendant SAE Magnetics (H.K.) Ltd. ("SAE") is a Chinese corporation with its principal place of business in Hong Kong, China, and became a wholly-owned subsidiary of TDK in 1986.[9]

34.    Defendant TDK Corporation—Hutchinson Technologies, Inc. ("HTI") is the successor to Hutchinson Technologies, Inc., which was acquired by TDK Corporation in October of 2016 for $126 million.[10]

35.    Defendant Headway Technologies, Inc. ("HT") is a Delaware corporation with its principal place of business in Milpitas, California. It is an affiliate of and wholly controlled by TDK Corporation.

36.    TDK Corporation, HT, HTI, MPT, MC, and SAE will be referred to collectively herein as "TDK."

## V.    AGENTS AND CO-CONSPIRATORS

37.    On information and belief, at all relevant times, other entities, and/or persons willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

38.    The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management and operation of Defendants' business or affairs.

39.    Whenever in this Complaint reference is made to any act, deed, or transaction of

---

[9]    *See* SAE, http://www.sae.com.hk/about-us.
[10]    *See* Press Release, TDK Global, TDK Corporation Announces Completion of Hutchinson Acquisition (Oct. 6, 2016), https://www.tdk.com/corp/en/news_center/press/201610062540.htm.

any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

40.     Each Defendant or co-conspirator acted as the principal, agent, or joint venture of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff. Each Defendant and co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for HDD SAs made by its parent company.

## VI.     INTERSTATE TRADE AND COMMERCE

41.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the provision of SAs for use in HDDs transmitted interstate between and among offices of Defendants and their customers located throughout the world, including throughout the United States.

42.     Throughout the Class Period, Defendants and their co-conspirators have each used instrumentalities of interstate commerce to manufacture, sell, distribute, and/or market HDD SAs in a continuous and uninterrupted flow of interstate commerce throughout the United States.

43.     Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.  During the Class Period, Defendants collectively controlled approximately 90% of the global HDD suspension parts market. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiff and other entities who are themselves engaged in commerce.

## VII.     FACTUAL ALLEGATIONS

### A.     The SA Market

44.     An SA is a suspension assembly used to hold the read-write head in HDDs. On its website, HTI describes the product as follows:

> Disk drives store and retrieve information by using magnetic recording

heads to write onto and read from rapidly spinning disks. Suspension assemblies hold the read/write head, allowing it to fly just above the surface of the spinning disk. The typical clearance between the head and the disk, called flying height, is about 8 nanometers. For comparison, a fingerprint is approximately 5,000 nanometers high.

\* \* \*

Suspension assemblies also provide the electrical interconnection from the read/write head to the drive's electronic circuitry. Electrical signals travel from the read/write head, through the suspension assembly's electrical conductors and into the disk drive. These electronic bits are then translated into digital content that you can read, watch or listen to.

Suspension assemblies are critical to the operation and performance of the disk drive. Our innovative product solutions provide enabling technology for superior disk drive performance, increased capacity and improved reliability.[11]

45.    The following photograph depicts typical SAs:



46.    A photograph on NHK's website depicts how the SAs are used as part of the triangular actuator arm holding the recording head over the circular disk:



---

[11]    *See Hard Disk Drive Suspensions*, TDK Hutchinson Technology Inc., https://www.hutchinson.tdk.com/WebHTI/Contents/PageId/31.

47. SAs are used with HDDs, which are sold both as stand-alone data storage devices and incorporated into a variety of electronics such as desktop and laptop computers, gaming systems, printers, and copy machines.

48. Global sales of SAs are still huge. HTI, which was estimated to have about 23.4% of that business in 2012, had aggregate global sales of approximately $240 million in 2015. TDK reported that its fiscal year 2016 sales for "magnetic application products" (HDD heads and SAs) totaled $1.945 billion globally. In 2018, global unit shipments of HDDs were nearly 400 million.[12]

49. The SA business is dominated by NHK and TDK. As noted previously, in 2015, it is estimated that TDK and NHK controlled over 80% of the market. This is a change from years past. Through 2006, the majority of SAs sold globally were made by HTI. In 2002 and 2003, it estimated its global market share at 55% and 60%, respectively. It began to lose market share significantly in 2007. In 2012 and 2013, it estimated its global market share to be only 19% and 21%, respectively. The market share it lost went to TDK and NHK. A fourth supplier of SAs—Suncall—is only a marginal player.

50. One commentator noted in 2008:

> The SA industry is now down to HTCH [HTI], NHK and TDK. NHK is a Japanese maker of precision springs and according to HTCH has been a rational competitor for over twenty years. TDK entered the business in late 2007 when it purchased Magnecomp. Only a couple of years ago, Magnecomp, a subsidiary of a Bangkok listed Magnetech, purchased the assets of KR Precision. This attempt at industry consolidation got off to a promising start but then started to struggle with manufacturing and customer qualification issues. In an effort to stay in the game, they cut prices on 3.5" ATA product to a point that HTCH walked away from some market share. By late 2007, TDK stepped in and bought the assets. TDK is a formidable company whose core competency is understanding ferrites, the basis for their leadership in read/write head technology. Like NHK, its balance sheet and recent earnings strongly suggest that they are smart business people. Most likely, the reason they bought it was to protect this franchise. It remains to be seen how long it will take them to fix the production assets of Magnecomp (it will require significant additional investment), but what I think we can count on is that going forward, the SA industry is likely to be dominated by three strong and rational players.

---

[12] *Worldwide Unit Shipments of Hard Disk Drives (HDD) from 1976 to 2022 (in millions),* STATISTA, https://www.statista.com/statistics/398951/global-shipment-figures-for-hard-disk-drives/.

As explained below, at least two of these "rational" players decided to protect themselves by subsequently colluding on SA prices.

51.    The market became even more concentrated in 2016. On November 1, 2015, the predecessor entity of HTI entered into a merger agreement with subsidiaries of TDK whereby HTI would become a wholly-owned subsidiary of TDK. As noted above, this deal was finalized in October of 2016.

52.    There are high barriers to entry into the SA market. In announcing the acquisition of MPT, TDK Corporation noted its technological strengths and expertise in the design and manufacture of SAs. HTI recently noted that it spent nearly $55 million between 2013 and 2015 on research and development.

53.    These types of heavy capital investments are not a new development. As one commentator noted in 2008 with respect to HTI:

> An easy knock on HTCH [HTI] would be to look at its history and see that while it has had some good CF generating years, it has had to put it all back into capital to stay in the game. For example, in 1997-99, HTCH spent heavily to install the ability to produce TSA, a "make a laminate and then etch it" process to incorporate the traces into the suspension and so do away with wires that needed costly and error-prone manual attachment. This is but one example of having to step up to meet the challenge of incorporating ever more functionality into less and less space, with millions of parts produced every week to the most exacting specifications. The latest "step change" has been to supplant TSA with an "additive" process. This is necessary because suspensions have gotten smaller and the number of leads going to the head is growing from two to six or more, and this cannot be accommodated with a "subtractive" process like TSA. In FY 05 to 07, HTCH spent close to $300MM above maintenance levels on capacity, in part because rapid growth in demand caught the HDD industry a little short, but also to install capacity for the "additive" process.

54.    In recent years, the number of HDDs produced has declined, as greater uses of solid state drives ("SSDs") (such as flash memory) or personal cloud network storage has occurred. Western Digital summed up the trend:

> The demand for hard drives in desktop and notebook PCs is in decline due to the slow-down in PC sales, the increased use of SSDs as replacements for HDDs in notebook PCs, and the growing shift of storage workloads to the cloud. Other HDD markets, such as cloud, traditional enterprise, branded products, gaming and other solutions have been expanding. We believe the units shipped in client hard

drives were down 12% in fiscal 2015 from fiscal 2014.[13]

55.    AnandTech.com has noted that sales of HDDs have been on a slow decline for years, falling by roughly 25 to 30 million units on average year-over-year. They reached an eight year low in 2015. The following chart depicts this:



56.    A TDK internal analysis noted these trends. It found that HDDs are in the "[m]aturity stage to declining stage." Therefore, Defendants had an incentive to stabilize or otherwise slow the deceleration in the prices for SAs as this decline occurred, just as they had an incentive to keep prices high in the period when sales of HDDs were increasing.

57.    Notwithstanding these declines, while estimated average prices for SAs fell in the period between 2010 and 2011, they leveled out somewhat thereafter and even increased in 2012, an unexpected result for a mature to declining product.

**B.    Characteristics of the HDD SA Market Render the Conspiracy More Plausible**

58.    Like other electronic product markets that have been the subject of antitrust investigations (cathode ray tubes, lithium ion batteries, and capacitors), the HDD SAs market has characteristics that make it susceptible to collusion, including high market concentration through the consolidation of manufacturers, interrelated business relationships, significant barriers to entry,

---

[13]    Western Digital Corp., Annual Report (Form 10-K) at 7 (Aug. 21, 2015)

maturity of the HDD SA market, and homogeneity of products. Together, these characteristics increase the probability and feasibility of anticompetitive conduct in the HDD SAs market.

### 1.    Market Consolidation and Concentration

59.    The HDD SA industry was highly concentrated during the Class Period, making it more susceptible to effective collusion and other anticompetitive practices.

60.    The demand for HDD SAs depends on the demand for HDDs which in turn is driven by the demand for HDD-based capacity, primarily fueled by the ever expanding consumer storage consumption and enterprise storage requirements.

61.    More than 200 companies have manufactured HDDs over time, most of which disappeared through bankruptcy or acquisitions. A period of market concentration beginning in the 1990s through 2002 was further aggravated by two factors: (a) further consolidation among HDD SA manufacturers, and (b) the vertical integration of companies like TDK that formerly depended on independent component suppliers in their manufacturing of HDDs. By 2008, consolidations had concentrated production to just a handful of HDD manufacturers. Consolidation continued during the Class Period. Today, only three HDD manufacturers remain: Western Digital Corporation, Seagate Technology, LLC, and Toshiba Electronics Devices & Storage Corporation. Their market shares are approximately 40%, 37%, and 23% respectively.[14]

62.    As the HDD market became increasingly concentrated, the SA industry experienced a similar trend of consolidation.

63.    By 2005, HTI held approximately 55% of the world market share and NHK Spring Co., Ltd. accounted for approximately 22% of the world market share in the SA industry.[15] MPT, created through the 2005 merger between the Data Storage Division of Magnecomp International Ltd. and KR Precision Public Company, occupied roughly 25% of the market in 2007.[16]

---

[14]    Tom Coughlin, *HDD Growth in Nearline Markets*, FORBES (Feb. 5, 2018), https://www.forbes.com/sites/tomcoughlin/2018/02/05/hdd-growth-in-nearline-markets/#2347c9b62997.

[15]    MPT 2005 Form 56-1 at 10, http://capital.sec.or.th/webapp/corp_fin/datafile/56/20050520E06.DOC.

[16]    *Id.*; News Release, KR Precision PCL, KR Precision Implements New Management Structure and Appoints New Director (Feb. 2, 2005), http://www.idema.org/wp-

64.     Further consolidation took place shortly before and during the Class Period. In 2007, TDK announced its acquisition of a majority share of Thailand-based MPT and began producing HDD SAs following the acquisition.

65.     By 2012, TDK, NHK Spring, and HTI collectively controlled 96% of the global suspension market.[17] In recent years, market consolidation has continued to the point where globally, there are now only two major suppliers of HDD SAs: TDK and NHK.

66.     In October 2016, TDK acquired HTI, increasing TDK's market share to 55-60%. Prior to the acquisition, HTI had gone through its own process of consolidation and was a principal supplier of HDD SAs to Western Digital Corporation (headquartered in San Jose, CA); Seagate Technology, LLC (Cupertino, CA); and SAE Magnetics, Ltd/TDK Corporation (Tokyo, Japan). That business is now contained within the TDK family. Following the acquisition, TDK and NHK became the world's only two primary producers of HDD SAs.[18]

67.     Collectively, Defendants controlled over 95% of the global market for HDD SAs throughout the Class Period.

### 2.     Interrelated Business Relationships

68.     The HDD SA industry has a close-knit nature whereby multiple business relationships between Defendants blurred the lines of competition and provided ample opportunity to collude. These business relationships also created a unity of interest among Defendants so that the conspiracy was easier to implement and enforce than if such interrelationships did not exist.

69.     For example, until March of 2015, TDK and NHK—two of the only three major competitors in the SA market—maintained a joint venture to manufacture SAs. Specifically, TDK's wholly owned subsidiary SAE Magnetics operated a joint venture with NHK in the SA

---

content/downloads/1171.doc; *The Opinion of Independent Financial Advisor* at 9, MPT (Nov. 27, 2007), https://capital.sec.or.th/webapp/corp_fin/datafile/TO/0520000103250-22007-12-06e02.pdf.

[17]     *See* Dr. Robert N. Castellano, *The Dynamics of the HDD Industry and Its Impact on CMP* at 9, INFORMATION NETWORK (2012), https://nccavs-usergroups.avs.org/wpcontent/uploads/CMPUG 2012/CMP2012_9castellano.pdf.

[18]     TDK Corporation Annual Report 2017, at 45, available at https://www.tdk.com/ir/ir_library/ annual/2017/html/index.html.

manufacturing company NAT H.K.[19] Throughout the Class Period, SAE Magnetics was also one of HTI's top three customers.[20] In addition, Defendants also cross-licensed each other's products, including SAs.[21]

### 3. High Barriers to Entry

70.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants to the market seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Thus, barriers to entry help facilitate the formation and maintenance of cartels.

71.     This is particularly true here where manufacturing HDD SAs requires the ability to produce precision assemblies in sufficient volume. It would require substantial time, resources and industry knowledge to even potentially overcome the barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for HDD products. As Defendant HTI conceded, "[W]e believe that the number of entities that have the technical capability and capacity for producing precision suspension assemblies or components in large volumes will remain small."[22]

72.     Collectively, Defendants also own the majority of patents for HDD SAs. These

---

[19]     *See* Press Release, TDK Global, TDK Subsidiary Dissolve Joint Venture of HDD Suspension Manufacturing Company, https://www.tdk.com/corp/en/news_center/press/201504011 768.htm; Hutchinson, Annual Report (Form 10-K) at 4 (Dec. 12, 2012) ("[o]ur principal competitors for suspension assemblies are Nihon Hatsujo Kabusikigaisha ('NHK'), Magnecomp Precision Technology Public Company Limited ('MPT'), a subsidiary of TDK Corporation, and NAT Peripheral (H.K.) Co., Ltd. (a joint venture of NHK and TDK Corporation.").

[20]     *See, e.g.,* Hutchinson, Annual Report (Form 10-K) at 5 (Dec. 11, 2008); Hutchinson, Annual Report (Form 10-K) at 4 (Dec. 12, 2012); Hutchinson, Annual Report (Form 10-K) at 4 (Dec. 11, 2015).

[21]     See *Hutchison, Magnecomp Drop Lawsuits, Cooperate*, Minneapolis/St. Paul Business Journal (Dec. 3, 2001), available at https://www.bizjournals.com/twincities/stories/2001/12/03/daily8.html.

[22]     Hutchinson, Annual Report (Form 10-K) at 6 (Dec. 11, 2008); Hutchinson, Annual Report (Form 10-K) at 4 (Dec. 11, 2015); *see also* William McConnell, *Hutchinson Shares Extend Slide On Continued FTC Antitrust Review*, THESTREET (Jan. 5, 2016), https://www.thestreet.com/story/13412469/1/Hutchinson-shares-keep-falling-on-extended-ftc-antitrust-review.html.

1  patents potentially place a significant and costly burden on potential new entrants, which must

2  avoid infringing on the patents when entering the market with a new product.

3          **4.**     **Market Maturity**

4       73.    Newer industries are typically characterized by rapid growth, innovation and high

5  profits. The HDD SA market is a mature one, and like many mature industries, is characterized by

6  slim profit margins, creating a motivation to collude.

7       74.    Demand for HDDs and therefore for SAs experienced a general downward trend

8  during the Class Period. Static or declining demand is another factor which makes the formation of

9  an effective collusive arrangement more likely because it provides a greater incentive to firms to

10  avoid price competition.

11       75.    Moreover, increased demand for other types of data storage technology, such as

12  those that utilize flash memory, limits opportunities for new entrants to the HDD SA market,

13  which caters to HDDs. This was one of the factors which led Defendants to engage in this alleged

14  price-fixing scheme in order to slow down declining prices.

15          **5.**     **Homogeneity of Products and Inelasticity of Demand**

16       76.    HDD SAs are commodity-like products which are interchangeable among products

17  of the same type and across manufacturers. One Defendant's product for a particular application,

18  such as a particular type/size of disk drive (e.g., 2.5" notebook HDD form factor or 3.5" desktop

19  HDD form factor), is substitutable for another's. Forming and sustaining a cartel when the product

20  in question is commodity-like makes it easier to agree on prices to charge and to monitor those

21  prices once an agreement is formed.

22       77.    "Elasticity" describes the sensitivity of supply and demand to changes in one or the

23  other such that demand is "inelastic" if an increase in the price of a product results in only a small

24  decline in the quantity sold of that product, if any, such that customers have nowhere to turn for

25  alternative, cheaper products of similar quality and so continue to purchase despite a price

26  increase.

27       78.    For a cartel to profit from raising prices above competitive levels, demand must be

28  relatively inelastic at competitive prices. Otherwise, increased prices would result in declining

sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

79.    Demand for HDD SAs is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase HDD SAs as an essential part of an HDD, or a product containing an HDD, even if the prices are kept at supra-competitive level.

**C.    Defendants' Unlawful Price-Fixing and Market Allocation Agreement**

80.    From at least as early as May 2008 and continuing until at least April 2016, Defendants knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by fixing prices for HDD SAs sold in the United States and elsewhere.

81.    To carry out their conspiracy, Defendants engaged in a variety of unlawful activities. At times, Defendants engaged in discussions and attended meetings during which they reached agreements to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD SAs to be sold in the U.S. and globally.

82.    Defendants also exchanged HDD SAs pricing information, including anticipated pricing quotes. Defendants used the exchanged pricing information to inform their negotiations with U.S. and foreign customers that purchased HDD SAs and produced HDDs for sale in, or delivery to, the United States and elsewhere.

83.    The conspiracy was likely to have been conducted at the highest levels of each Defendant's HDD suspension division or operations. For NHK, those people include Taro Umemura (President), Tetsuya Fujiwara (Vice-President of NHK's Disk Drive Suspension Division), and Kazuhisa Rikitoku (Vice-President of Sales).  For TDK, they include Seiji Osaka (General Manager for Electronic Components Sales & Marketing) and Hiroyuki Uemura (CEO for the electronics components business). For MPT, they include Albert Ong (President & CEO), Thiti Makarabhirom (Vice-President of Operations), and Teppei Watanabe (Executive Director). For NHK International Corporation, they include Makato Harada (President) and Taeki Takahashi (Senior Managing Director).

84.    Opportunities to effectuate the conspiracy also likely took place through NAT H.K.,

1   the entity that was created by SAE Magnetics (a subsidiary of TDK) and NHK Spring Co., Ltd.

2       85.    Opportunities to effectuate the conspiracy took place at meetings of IDEMA, the

3   International Disk Drive Equipment & Materials Association, to which NHK Spring Co., Ltd.,

4   SAE Magnetics, and TDK Corporation all belong. IDEMA has two operating subsidiaries, one in

5   Japan and another in the United States. Among other things, IDEMA sponsors Diskcon industry

6   conferences, such as the one held in Japan in 2010 and those held or to be held in the United States

7   in 2011 and October of this year. One of the asserted benefits to belonging to IDEMA is that it

8   offers "unique networking opportunities for all industry participants."

9       **D.    Action By Antitrust Regulators Reveals The Price-Fixing Conspiracy**

10       86.    As noted above, on July 26, 2016, the JFTC raided the Japanese offices of TDK and

11   NHK in connection with an investigation of price-fixing of SAs.

12       87.    The *Japan Times* reported as follows on the raids:

13       The Fair Trade Commission searched the offices of TDK Corp. and NHK Spring
14       Co. on Tuesday on suspicion they formed a price cartel for electronics parts for
          hard disk drives, sources said. The two manufacturers of electronics components
15       have allegedly set retail prices for suspensions, which are used for hard drives in
          personal computers and gaming consoles, in consultation with each other in
16       violation of the anti-monopoly law, the sources said.

17       88.    As noted in the quotation in section I of this complaint, NHK World reported that

18   the conspiracy involved bid-rigging and a price-fixing cartel that has operated for a number of

19   years. As also noted above, NHK has confirmed the raid on it.

20       89.    Concurrent with the JFTC investigation, the DOJ opened an investigation regarding

21   HDD SAs, and on July 26, 2016 HTI received a letter from the DOJ requesting documents relating

22   to the investigation.[23]   At the time, TDK Corporation's pending acquisition of HTI was under

23   review by the U.S. Federal Trade Commission.[24]

24       90.    On February 9, 2018, the JFTC fined NHK and another company (believed to be

25   TDK) 1.1 billion yen (approximately $9.9 million) saying that it found that they substantially

26
27   [23]    *See Hutchinson Technology Provides Update on Legal and Regulatory Actions*,
      GLOBENEWSWIRE (July 27, 2016), https://www.globenewswire.com/news-release/2016/07/27/859
      501/0/en/Hutchinson-Technology-Provides-Update-on-Legal-and-Regulatory-Actions.html.
28   [24]    *Id.*

restrained competition in the field of sales of suspension for the Japanese customer by agreeing to maintain sales price of suspension.[25]

91.     On February 28, 2018, it was reported:

CADE's General Superintendence initiated an Administrative Proceeding to investigate the practice of an international cartel that could have possible effects in Brazil, in the market of hard disk components, used in computers and known as suspension assemblies.

Those components keep the position of a magnetic support reader, above the surface of a drive, which spins at great a rate.

The five investigated companies are Hutchinson Technology Inc.; Magnecomp Precision Technology Public Co. Ltd; NHK Spring Co., Ltd.; TDK Corporation; and SAE Magnetics (H.K.) Ltd.

According to the Technical Note of the initiation of the investigation, there are several evidences that the companies divided the market and fixed prices in response to costumer's quotation requests. The companies also shared competitive sensible information, mainly related to (I) current, potential and proposed prices to suspension assemblies, (II) private clients' biddings, (III) resource allocation of costumers, (IV) production capacity and (V) usage fees of each company.

The anticompetitive practices would have been perpetrated by, at least, 38 individuals connected with the companies, and implemented through meetings and email exchanges, between 2003 and May 2016.[26]

92.     On July 29, 2019, the DOJ filed a one-count information against NHK. The information stated that "[t]he charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendant and its co-conspirators, the substantial terms of which were to refrain from competing on prices for, fix the prices of, and allocate their respective market shares for, HDD suspension assemblies to be sold in the United States and elsewhere."

93.     As noted above, the same day, NHK agreed to plead guilty and pay a $28.5 million fine. In a press release announcing the fine, DOJ stated:

According to a one-count felony charge filed today in the U.S. District Court for

---

[25]     *See* Press Release, JFTC (Feb. 9, 2018), https://www.jftc.go.jp/houdou/pressrelease/h30/feb/180209_1.html.

[26]     *See* Press Release (Apr. 26, 2018), CADE's General Superintendence Probes Cartel in the Global Market for Hard Disk Components, available at http://en.cade.gov.br/cades-generalsuperintendence-probes-cartel-in-the-global-market-for-hard-disk-components-1.

the Eastern District of Michigan in Detroit, NHK Spring reached agreements with co-conspirators to refrain from price competition and allocate their respective market shares for suspension assemblies used in hard disk drives. Pursuant to their agreements not to compete, NHK Spring and its co-conspirators exchanged pricing information including anticipated pricing quotes, which they used to inform their negotiations with U.S. and foreign customers that purchased suspension assemblies and produced hard disk drives for sale in, or delivery to, the U.S. and elsewhere. NHK Spring participated in the conspiracy from at least as early as May 2008 and continuing until at least April 2016. Subject to court approval, the company has agreed to plead guilty, to pay a $28.5 million criminal fine, and to cooperate in the ongoing investigation.

"Today's charge affirms the Antitrust Division's commitment to eradicate price fixing by companies, foreign or domestic," said Assistant Attorney General Makan Delrahim of the Antitrust Division. "While these parts are physically small, they are critical to the operation and performance of electronic devices, and their impact on American consumers and businesses is direct and substantial."[27]

94.     It is believed that TDK—which is a leniency applicant to the DOJ in connection with the price-fixing of Inductors—disclosed to the DOJ the existence of the conspiracy involving SAs for HDDs.

95.     The significance of a company seeking Type B leniency cannot be understated. According to the DOJ's "Frequently Asked Questions" about the Antitrust Division's Leniency Program (as updated on January 26, 2017), an applicant for Type B leniency must admit to participating in a criminal violation of the antitrust laws:

> 5. *Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?*
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the Leniency Program.

96.     As indicated on the same DOJ webpage, the leniency applicant must also establish

---

[27]     Press Release, DOJ, Japanese Manufacturer Agrees to Plead Guilty to Fixing Prices for Suspension Assemblies Used in Hard Disk Drives (July 29, 2019), https://www.justice.gov/opa/pr/japanese-manufacturer-agrees-plead-guilty-fixing-prices-suspension-assemblies-used-hard-disk.

"[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

## VIII.    CLASS ACTION ALLEGATIONS

97.    Plaintiff therefore bring this action on its own behalf and as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following Class (the "Nationwide Class"):

> All persons and entities that indirectly purchased a product not for resale which included as a component part one or more suspension assemblies for use in hard disk drives from Defendants or any predecessor, subsidiary or affiliate thereof, at any time during the Class Period of May 2008 and the present.

98.    Plaintiff also brings this action on behalf of himself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to California Business and Professions Code section 16700, *et seq*. (the "Cartwright Act") as well as common law unjust enrichment on behalf of the following class (the "Damages Class"):

> All persons and entities who, during the Class Period of May 2008 through the present, in the Indirect Purchaser States[28] purchased a product not for resale which included as a component part one or more suspension assemblies for use in hard disk drives that were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants.

99.    The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, Defendants' officers, directors, employees, and immediate families, any judges or justices assigned to hear any aspect of this action, and persons who purchased HDD SAs directly or for resale.

100.    While Plaintiff does not know the exact number of members of each Class, Plaintiff believes that Class members number at least in the thousands, and are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is

---

[28]    The "Indirect Purchaser States" include Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

impracticable.

101.    There are questions of law and fact which are common to the claims of Plaintiff and the Class, including, but not limited to:

        a.    Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices of SAs sold in the United States;

        b.    Whether Defendants engaged in a combination or conspiracy with their co-conspirators to rig bids for SAs;

        c.    Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices of SAs;

        d.    The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for SAs;

        e.    Whether Defendants violated the Sherman Act;

        f.    Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

        g.    Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages;

        h.    The identity of the participants of the alleged conspiracy;

        i.    Whether the alleged conspiracy violated state antitrust, unfair competition, and/or consumer protection laws, as alleged herein;

        j.    Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged herein;

        k.    The effect of the alleged conspiracy on the prices of HDD SAs sold in the United States during the Class Period;

        l.    Whether Plaintiff and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

    m. Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the members of the Classes;

    n. The appropriate injunctive and related equitable relief for the Nationwide Class; and

    o. The appropriate class-wide measure of damages for the Damages Class.

102. Plaintiff's claims are typical of the claims of the members of the Classes.

103. Plaintiff will fairly and adequately assert and protect the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff and all members of the Classes are similarly affected by the Defendants' wrongful conduct in that they paid artificially inflated prices for HDD SAs purchased indirectly from the Defendants and/or their co-conspirators.

104. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

105. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members. After determination of the predominant common issues identified above, if necessary and appropriate, the Classes can be divided into logical and manageable subclasses

106. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

    a. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

    b. Each Class is readily definable and one for which records should exist in the files of Defendants.

    c. Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.     Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.     Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

f.     Defendants have acted, and/or refused to act, on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

g.     In the absence of a class action, Defendants would be unjustly enriched because they would be able to retain the benefits and fruits of their wrongful conduct.

107.   This class action presents no difficulties of management that would preclude its maintenance as a class action.

## IX.     PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

108.   Defendants' price-fixing conspiracy had the following effects among others:

(a)     Price competition has been restrained or eliminated with respect to HDD SAs;

(b)     The prices of HDD SAs have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Indirect purchasers of HDD SAs have been deprived of free and open competition; and

(d)     Indirect purchasers of HDD SAs paid artificially inflated prices for HDD SAs.

109.   During the Class Period, Plaintiff and the members of the Classes paid supra-competitive prices for HDD SAs. HDD manufacturers and other purchasers of HDD SAs passed on inflated prices to Plaintiff and the members of the Classes. Those overcharges have unjustly enriched Defendants.

110.   The markets for HDDs and HDD SAs are inextricably linked and intertwined

because the market for HDD SAs exists to serve the HDD market. Without the HDDs, the HDD SAs have little to no value because they have no independent utility.

111.    HDD SAs are identifiable, discrete physical products that remain essentially unchanged when incorporated into an HDD. As a result, HDD SAs follow a traceable physical chain of distribution from the Defendants to Plaintiff and the members of the Classes, and costs attributable to HDD SAs can be traced through the chain of distribution to Plaintiff and the members of the Classes.

112.    Just as HDD SAs can be physically traced through the supply chain, so can their prices be traced to show that changes in the prices paid by direct purchasers of HDD SAs affect prices paid by indirect purchasers for HDDs containing HDD SAs.

113.    While even a monopolist would increase its prices when the cost of its inputs increased, the economic necessity of passing through cost changes increases with the degree of competition a firm faces.

114.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule."[29]

115.    As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

As is well known in economic theory and practice, at least some of the overcharge

---

[29]    Robert G. Harris & Lawrence A. Sullivan, Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis, 128 U. PA. L. REV. 268, 275 (1979).

will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers. . . . Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.[30]

116.    The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of HDD SAs and, as a direct and foreseeable result, the price of products containing HDD SAs. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis – called regression analysis – is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of HDD SAs on prices for products containing HDD SAs even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of HDD SAs affects changes in the price of assembled products, such as computers. In such models, the price of HDD SAs would be treated as an independent or explanatory variable. The model can isolate how changes in the price of HDD SAs impact the price of products containing HDD SAs while controlling for the impact of other price-determining factors.

117.    The precise amount of the overcharge impacting the prices of products containing HDD SAs can be measured and quantified. Commonly used and well accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiff and members of the Classes can be quantified.

118.    By reason of the violations of the antitrust law alleged herein, Plaintiff and the

---

[30]    Order re: Class Certification at 13-14, Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases, No. J.C.C.P. No. 4106 (Cal. Sup. Ct. Aug. 29, 2000).

members of the Classes have sustained injury to their businesses or property, having paid higher prices for HDD SAs than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## X.    PLAINTIFF'S CLAIMS ARE TIMELY

### A.    Defendants Have Engaged in a Continuing Violation

119.    Plaintiff repeats and re-alleges the allegations set forth above.

120.    Plaintiff and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein.

121.    Plaintiff and members of the Classes are consumers who purchased HDDs containing HDD SAs for their own use and not for resale. No information in the public domain was available to Plaintiff and members of the Classes prior to July 26, 2016. Moreover, Plaintiff and members of the Classes had no direct contact or interaction with the Defendants and had no means from which they could have discovered that the Defendants were engaged in the combination and conspiracy alleged herein before July 26, 2016.

122.    This Complaint alleges a continuing course of conduct (including conduct within the applicable limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

123.    Each time Defendants engaged in an unlawful act complained of here, Defendants undertook an overt act that has inflicted harm on Plaintiff and other members of the Classes.

124.    Because Defendants have engaged in a continuing course of conduct, Plaintiff's claims are timely.

### B.    Fraudulent Concealment Tolled the Statute of Limitations

125.    In the alternative, the fraudulent concealment doctrine tolls the statute of limitations applicable to the claims asserted herein by Plaintiff and the Classes.  Plaintiff and members of the proposed Classes had neither actual nor constructive knowledge of the facts constituting its claims

for relief, and did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of a conspiracy alleged herein that affected purchasers in the United States until July 26, 2016, the date that the JFTC's raid on Defendants TDK and NHK became public.

126.    Defendants engaged in a secret conspiracy and did not reveal facts that would put Plaintiff or the Classes on inquiry notice that there was an agreement to fix prices for SAs, or that they were paying supra-competitive prices for HDD SAs through the United States. No information, actual or constructive, was ever made available to Plaintiff and members of the Classes that even hinted to Plaintiff that they were being injured by Defendants' unlawful conduct.

127.    By their very nature, price-fixing conspiracies are inherently self-concealing. Plaintiff believes that Defendants agreed among themselves to conceal their unlawful conspiracy, including by agreeing not to discuss the conspiracy publicly and by other means of avoiding detection and maintaining secrecy, such as the use of nonpublic e-mails and private telephone calls, as described above. Accordingly, Plaintiff could not have had either actual or constructive knowledge of the price fixing scheme until the public disclosure of the JFTC's raids.

128.    Defendants actively misled their customers about the price-fixing scheme. Their various justifications for price increases did not disclose that they had agreed among themselves to fix, raise and/or stabilize the price of SAs. Defendants' justifications for their price increases were also misleading, to the extent they were true even in part, because of their failure to disclose that the price increases in fact resulted from their illegal agreement and conspiracy. HDD SAs are not exempt from antitrust regulation and, thus, Plaintiff and members of the Classes reasonably considered the HDD SAs industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' HDD SAs prices before July 26, 2016.

129.    Because Defendants' agreement, understanding and conspiracy was kept secret, Plaintiff and members of the Classes were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for SAs during the Class Period.

130.    For these reasons, the statute of limitations applicable to Plaintiff's and the Classes'

1  claims was tolled and did not begin to run until July 26, 2016.

2  **XI.    CAUSES OF ACTION**

3  <u>**FIRST CLAIM FOR RELIEF**</u>
   **Violation of Section 1 of the Sherman Act**
4  **(on behalf of Plaintiff and the Nationwide Class)**

5       131.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth
6  herein.

7       132.    Beginning at a time unknown to Plaintiff, the exact dates exclusively within the
8  knowledge of Defendants, Defendants and their co-conspirators engaged in a continuing contract,
9  combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of SAs
10 sold in or to United States in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) during the
11 Class Period.

12      133.    The acts done by the Defendants as part of, and in furtherance of, their and their co-
13 conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their
14 officers, agents, employees, or representatives while actively engaged in the management of their
15 affairs.

16      134.    In formulating and effectuating their contract, combination or conspiracy,
17 Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect
18 of which were to artificially fix, raise, maintain and/or stabilize the prices of SAs sold during the
19 Class Period.

20      135.    Defendants' anticompetitive acts were intentionally directed at the United States
21 market for HA SA products and had a substantial and foreseeable effect on interstate commerce by
22 raising and fixing prices for HD SAs throughout the United States and elsewhere.

23      136.    The conspiratorial acts and combinations have caused unreasonable restraints in the
24 markets for HDD SAs.

25      137.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated
26 indirect purchasers in the Nationwide Class who purchased HDD SAs have been harmed by being
27 forced to pay inflated, supra-competitive prices for HDD SAs.

28      138.    In formulating and carrying out the alleged agreement, understanding and

conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

139.    The illegal combination and conspiracy alleged herein had the following effects, among others:

a.    Prices for SAs sold by Defendants and their co-conspirators have been fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels throughout the United States;

b.    Plaintiff and members of the Nationwide Class who purchased HDD SAs indirectly from Defendants have been deprived of the benefits of free and open competition in the SA market; and

c.    Price competition in the market for HDD SAs has been restrained, suppressed or eliminated in the United States.

140.    As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Nationwide Class have been injured and damaged in their business and property, and will continue to be injured in their business and property by paying more for HDD SAs purchased indirectly from Defendants and their co-conspirators than they would have paid than they would have and will pay in absence of the conspiracy.

141.    The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

142.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of Section 16720 of the
### California Business and Professions Code ("The Cartwright Act")
### (on behalf of Plaintiff and the Damages Class)

143.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

144.    The violations of federal antitrust law set forth above also constitute violations of

1  section 16720 of California Business and Professions Code.

2    145.    Defendants and their co-conspirators engaged in a continuing contract, combination

3  or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct

4  alleged above in violation of California Business and Professions Code section 16700, *et seq*.

5    146.    Defendants' anticompetitive acts described above were knowing, willful and

6  constitute violations or flagrant violations of California Business and Professions Code section

7  16700, *et seq*.

8    147.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

9  members of the Damages Class have been injured in their business and property in that they paid

10  more for HDD SAs than they otherwise would have paid in the absence of Defendants' unlawful

11  conduct. As a result of Defendants' violation of section 16720 of California Business and

12  Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost

13  of suit, including reasonable attorneys' fees, pursuant to section 16750(a) of California Business

14  and Professions Code.

15
16
### THIRD CLAIM FOR RELIEF
#### Unjust Enrichment

17    148.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth

18  herein.

19    149.    To the extent required, this claim is pled in the alternative to the other claims

20  herein.

21    150.    Defendants have financially benefited from overcharges on sales of HDD SAs,

22  which resulted from the unlawful and inequitable acts alleged in this Complaint. These

23  overcharges were borne by Plaintiff and members of the Classes who purchased HDD SAs. The

24  benefits conferred upon Defendants are substantial and measurable, in that the revenues

25  Defendants have earned due to unlawful overcharges are ascertainable by review of both sales

26  records and the unlawful agreement itself.

27    151.    There is gross disparity between the price that Plaintiff and members of the Classes

28  paid for HDD SAs compared to what they would have paid but for Defendants' unlawful and

1  inequitable conduct.

2      152.    Defendants repeatedly and continuously received financial benefits at the expense

3  of Plaintiff and members of the Classes through each sale of HDD SAs at an inflated price.

4      153.    It would be futile for Plaintiff and members of the Classes to seek a remedy from

5  any party with whom they had or have privity of contract. Defendants have paid no consideration

6  to any other person for any of the benefits they received indirectly from Plaintiff and members of

7  the Classes.

8      154.    It would be futile for Plaintiff and members of the Classes to seek to exhaust any

9  remedy against the immediate intermediary in the chain of distribution from which they indirectly

10  purchased HDD SAs, as those intermediaries cannot reasonably be expected to compensate

11  Plaintiff and members of the Classes for Defendants' unlawful conduct.

12      155.    The financial benefits that Defendants derived rightfully belong to Plaintiff and

13  members of the Classes, which paid anticompetitive prices that inured to Defendants' benefit.

14      156.    It would be inequitable under the unjust enrichment principles of the states listed

15  below for Defendants to retain any of the overcharges that Plaintiff and members of the Classes

16  paid for HDD SAs, which were derived from Defendants' anticompetitive, unfair, and

17  unconscionable methods, acts, and trade practices.

18      157.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds

19  received by them into a common fund for the benefit of Plaintiff and members of the Classes.

20      158.    A constructive trust should be imposed upon all unlawful or inequitable sums

21  Defendants received, which arise from overpayments for HDD SAs by Plaintiff and members of

22  the Classes.

23      159.    Plaintiff and members of the Classes have no adequate remedy at law.

24      160.    By engaging in the foregoing unlawful or inequitable conduct, Defendants have

25  been unjustly enriched in violation of the common law of the states listed below.

26                                    **California**

27      161.    Defendants unlawfully overcharged members of the Classes, who purchased HDD

28  SAs in California at prices that were more than they would have been but for Defendants' actions.

CLASS ACTION COMPLAINT
- 33 -

1  Defendants have received a benefit from the Classes as a direct result of the unlawful overcharges.

2  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances

3  at the expense of the Classes.

4  **Illinois**

5  162.    Defendants unlawfully overcharged members of the Classes, who purchased HDD

6  SAs in Illinois at prices that were more than they would have been but for Defendants' actions.

7  The Classes have conferred an economic benefit upon Defendants, in the nature of revenue

8  resulting from unlawful overcharges to the economic detriment of the Classes. Defendants retained

9  the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to

10  the Classes. It is against equity, justice, and good conscience for Defendants to be permitted to

11  retain the revenue resulting from their unlawful overcharges

12  **Massachusetts**

13  163.    Defendants unlawfully overcharged members of the Classes, who purchased HDD

14  SAs in Massachusetts at prices that were more than they would have been but for Defendants'

15  actions. The Classes has conferred an economic benefit upon Defendants, in the nature of revenue

16  resulting from unlawful overcharges to the economic detriment of the Classes. Defendants were

17  aware of or appreciated the benefit conferred upon them by the Class. Under the circumstances, it

18  would be inequitable for Defendants to retain such benefits without compensating the Classes.

19  **XII.  PRAYER FOR RELIEF**

20  Accordingly, Plaintiff, on behalf of itself and the Classes of all others so similarly situated,

21  respectfully requests that:

22  A.    The Court determine that this action may be maintained as a class action under Rule

23  23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of

24  this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to

25  members of the Class;

26  B.    The Court adjudge and decree that the contract, combination and conspiracy alleged

27  herein is:

28  (a)    An unreasonable restraint of trade or commerce in violation of Section 1 of

the Sherman Act;

    (b)    A *per se* violation of Section 1 of the Sherman Act;

    (c)    An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

    (d)    Acts of unjust enrichment by Defendants as set forth herein.

C.    The Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class;

D.    Plaintiff and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

E.    Plaintiff and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

F.    The Court award Plaintiff and the Classes' attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

G.    Plaintiff and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

H.    Plaintiff and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

I.    Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy,

1    agreement, understanding or concert of action, or adopting any practice, plan, program or design

2    having a similar purpose or affect in restraining competition; and

3          J.      The Court award Plaintiff and the Classes such other and further relief as may be

4    deemed necessary and appropriate.

5                       **DEMAND FOR JURY TRIAL**

6        Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, on behalf of itself and the

7    Classes of all others similarly situated, Plaintiff hereby demands a jury trial for all issues triable by

8    a jury.

9    Dated: August 30, 2019             Respectfully submitted,

10                              **WOLF HALDENSTEIN ADLER**
                               **FREEMAN & HERZ LLP**

11

12                 By:       *_/s/ Betsy C. Manifold_*

13                               BETSY C. MANIFOLD

14

15                   BETSY C. MANIFOLD
                  manifold@whafh.com

16                   RACHELE R. BYRD
                  byrd@whafh.com999

17                   MARISA C. LIVESAY
                  livesay@whafh.com

18                   BRITTANY N. DEJONG
                  dejong@whafh.com

19                   750 B Street, Suite 1820
                  San Diego, CA 92101

20                   Telephone:   619/239-4599
                  Facsimile:    619/234-4599

21                   **WOLF HALDENSTEIN ADLER**
                   **FREEMAN & HERZ LLP**

22                   FRED TAYLOR ISQUITH
                  isquith@whafh.com

23                   THOMAS H. BURT
                  burt@whafh.com

24                   270 Madison Avenue
                  New York, New York 10016

25                   Telephone: 212/545-4600
                  Facsimile:   212/545-4653

26

27                   **WOLF HALDENSTEIN ADLER**
                   **FREEMAN & HERZ LLP**

28                   CARL MALMSTROM

malmstrom@whafh.com
111 West Jackson, Suite 1700
Chicago, IL 60604
Telephone: 312/984-0000
Facsimile:  312/212-4401

**PRITZKER LEVINE LLP**
ELIZABETH C. PRITZKER (146267)
ecp@pritzkerlevine.com
JONATHAN K. LEVINE (220289)
jkl@pritzkerlevine.com
CAROLINE C. CORBITT (305492)
ccc@pritzkerlevine.com
180 Grand Avenue, Suite 1390
Oakland, CA 94612
Telephone:  415/692-0772
Facsimile:  415/366-6110

**VITA LAW OFFICES PC**
RICHARD J. VITA
RJV@VitaLaw.com
100 State Street, Suite 900
Boston, MA 02109
Telephone: 617/426-6566
Facsimile:  617/429-2119

*Counsel for Plaintiff Apex Computers, Inc.*

25874v2